IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| TRACY L. SUNDERLAGE; LINDA | ) | Civil No. 11-cv-4713 |
| SUNDERLAGE; SUNDERLAGE RESOURCE | ) | |
| GROUP INTERNATIONAL, LTD. a/k/a SRG | ) | |
| INTERNATIONAL LTD.; SRG | ) | |
| INTERNATIONAL U.S. LLC; MAVEN U.S. | ) | |
| LLC d/b/a MAVEN LLC; and RANDALL | ) | |
| ADMINISTRATION LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT FOR PERMANENT INJUNCTION AND OTHER RELIEF

Plaintiff United States of America, for its complaint against defendants Tracy L.

Sunderlage, Linda Sunderlage, Sunderlage Resource Group International, Ltd., also known as

SRG International Ltd., SRG International U.S. LLC, Maven U.S. LLC, and Randall

Administration LLC (collectively, "Defendants"), states as follows:

### NATURE OF ACTION

1.      Defendants organize, operate, and promote a scheme that claims to enable participating

owners of small, closely-held companies ("Owners") to avoid income taxes.  The scheme

involves having the Owners' companies make purportedly tax-deductible contributions to

purported "welfare benefit plans" for the ostensible purpose of providing employee benefits like

life insurance and health insurance.  But in fact the bulk of the money is routed into various

investments that are held solely for the Owners' future use ("the Employee Benefit Scheme").

2.      Tracy L. Sunderlage ("Sunderlage"), personally and through SRG International Ltd. and

SRG International U.S. LLC, claims that the Employee Benefit Scheme provides participants

with a more lucrative and tax-advantaged method to accrue wealth than other investment options can offer.

3.     Participants from across the nation have contributed at least $239 million to the Employee Benefit Scheme, and total contributions may exceed $300 million.

4.     More than a decade ago, the IRS ruled that the Employee Benefit Scheme did not comply with federal tax law.  Yet Sunderlage has continued to falsely claim that the Employee Benefit Scheme is in compliance.

5.     Although the Employee Benefit Scheme's form has changed over time, its substance remains the same.  The current version of the Employee Benefit Scheme is called the "Maven Structure."  Participating companies make purportedly tax-deductible payments to so-called "single employer plans," ostensibly to provide benefits to their employees.  But most of the funds are invested in offshore accounts until the Owners seek a withdrawal.

6.     The United States brings this complaint pursuant to 26 U.S.C. ("I.R.C.") §§ 7402 and 7408 to enjoin Sunderlage, SRG International Ltd., SRG International U.S. LLC, and any other person in active concert or participation with them, from directly or indirectly:

   a.  Promoting or selling any version of the Employee Benefit Scheme described in this complaint;

   b.  Promoting or selling any plan or arrangement that is similar to the Employee Benefit Scheme, including any plan or arrangement that claims to be a welfare benefit plan or to allow an employer to make deductible contributions to a welfare benefit fund under I.R.C. § 419 and/or I.R.C. § 419A;

    c.   Promoting or selling any plan or arrangement that advises or assists others in violating or attempting to violate the internal revenue laws or unlawfully evading the assessment or collection of one's federal tax liabilities;

    d.   Engaging in conduct subject to penalty under I.R.C. § 6700, *i.e.*, organizing or selling any plan or arrangement and in connection therewith (a) making a gross valuation overstatement or (b) making or furnishing false or fraudulent statements with respect to the tax benefits derived from participation in a plan or arrangement, when he knows and/or has reason to know the statements are false or fraudulent as to a material matter; and

    e.   Engaging in any other conduct subject to penalty under any provision of the Internal Revenue Code.

7.    Further, the United States brings this complaint pursuant I.R.C. §§ 7402 and 7408 to enjoin all Defendants, and any other person in active concert or participation with them, from directly or indirectly:

    a.   Acting as trustee or administrator for, or otherwise organizing, administering, or implementing any version of the Employee Benefit Scheme described in this complaint;

    b.   Acting as trustee or administrator for, or otherwise organizing, administering, or implementing any plan or arrangement that is similar to the Employee Benefit Scheme, including any plan or arrangement that claims to be a welfare benefit plan or to allow an employer to make deductible contributions to a welfare benefit fund under I.R.C. § 419 and/or I.R.C. § 419A;

    c.   Organizing, administering, or implementing any plan or arrangement that advises or assists others in violating or attempting to violate the internal revenue laws or unlawfully evading the assessment or collection of one's federal tax liabilities;

    d.   Selling or organizing, or causing the sale or organization of, any type of corporation, trust, limited liability company, arrangement of business entities, or plan which he knows or has reason to know is designed to or will be used to facilitate non-compliance with the federal tax laws; and

    e.   Engaging in any other conduct that substantially interferes with the administration or enforcement of the internal revenue laws.

### JURISDICTION AND VENUE

8.    This Court has jurisdiction under 28 U.S.C. §§ 1340 and 1345, and I.R.C. §§ 7402(a) and 7408.

9.    This action for injunctive relief is brought at the request of the Chief Counsel of the Internal Revenue Service, a delegate of the Secretary of the Treasury, and commenced at the direction of a delegate of the Attorney General of the United States, pursuant to I.R.C. §§ 7402 and 7408.

10.    Venue is proper in this Court under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to this suit took place in this district.

### THE DEFENDANTS AND OTHER ACTORS

#### A. Tracy and Linda Sunderlage

11.    Defendant Tracy Sunderlage resides with his wife and co-defendant Linda Sunderlage in Huntley, Illinois.

12.     Sunderlage holds himself out as one who has personally participated in the development
of the tax laws applicable to employee benefit plans, also known as welfare benefit plans.

13.      Sunderlage claims to have over forty years of experience in the life insurance industry.
He is currently licensed by the Illinois Department of Insurance to sell insurance products and
has earned commissions from the sale of insurance products in connection with the Employee
Benefit Scheme.

14.     Sunderlage is currently a defendant in multiple lawsuits brought by current and former
participants in the Employee Benefit Scheme.  In July 2009, a Nebraska state court in one of
these actions sanctioned Sunderlage in response to his "delay, misstatements of fact, and
harassment" with respect to that lawsuit, his "willful disregard of Orders made by this Court,"
and his protraction of the litigation in a manner that was "both unnecessary and wasteful."
Order, *Bowman et al. v. Denham et al.*, Doc. 1090 page 620 (Neb. Dist. Ct. July 1, 2009).

15.     In 1986, the U.S. Securities and Exchange Commission ("SEC") obtained a permanent
injunction against Sunderlage.  *See SEC v. TLS Financial Services, Inc. and Tracy Sunderlage*,
Case No. 86-c-6101 (N.D. Ill. Aug. 18, 1986).  The injunction, to which Sunderlage consented,
enjoined him from misrepresenting the risks of an investment, commissions he earned on the sale
of securities, potential conflicts of interest, and expected returns on investments.  The injunction
also barred Sunderlage from selling the securities of any issuer or being an investment adviser
unless he met certain conditions.

16.     In the 1990s, Sunderlage participated in an illegal tax evasion scheme known as the
Aegis trust scheme.  He also sold the Aegis trust package to at least one Employee Benefit
Scheme participant.  The purpose and effect of the Aegis trust scheme was to defraud the United
States by attempting to fraudulently conceal participants' assets and income from the IRS and to

illegally reduce or eliminate their income tax liability. The primary Aegis promoters have been sentenced to a combined total of 78 years in prison for their roles in the scheme.

17.     Defendant Linda Sunderlage ("Linda") has or has previously held Series 7 and Series 63 securities licenses. Until 2007, Linda was licensed by the Illinois Department of Insurance to sell insurance products. She has earned commissions from the sale of insurance products in connection with the Employee Benefit Scheme.

### B. Administrators

18.     At its inception in 1989, the Employee Benefit Scheme operated through the Eagle Benefit Trust. Sunderlage participated in the formation of the Eagle Benefit Trust. By 1990, the Professional Benefit Trust Multiple Employer Welfare Benefit Plan and Trust (the "PBT Multiple Employer Plan") took over as the entity through which the Employee Benefit Scheme operated.

19.     By 1991, Sunderlage and Linda administered the PBT Multiple Employer Plan through Sunderlage Resource Group, Inc. ("SRG"), an Illinois company currently operated out of an office at 2380 Esplanade Drive, Suite 203, Algonquin, Illinois. Sunderlage is the President, CEO, and Chairman of the Board of SRG, and Linda is the Secretary. In addition to holding these positions, Sunderlage and Linda are both owners of SRG.

20.     In 1997, Sunderlage and Linda began using the company PBT Administration, LLC ("PBT Admin") to administer the Employee Benefit Scheme. Sunderlage and Linda, directly or through companies they owned, served as members of PBT Admin. Linda oversaw PBT Admin's daily operations (including the hiring and firing of employees) and handled administrative and banking matters related to administering the Employee Benefit Scheme for new and existing participants. Sunderlage served as PBT Admin's managing member. PBT

Admin served as administrator of the Employee Benefit Scheme until 2010.  At the time of its

dissolution in 2010, PBT Admin operated out of 2380 Esplanade Drive, Suite 203, Algonquin,

Illinois.

21.     Defendant Randall Administration LLC ("Randall Administration") and another

company, Hess Management Ltd., are the current administration companies for the Employee

Benefit Scheme.  Randall Administration is an Illinois company owned by defendant SRG

International U.S. LLC and operated out of 2380 Esplanade Drive, Suite 203, Algonquin,

Illinois.  Although Hess Management Ltd.'s letterhead states that it is located in the Bahamas,

Sunderlage – an Illinois resident – is the company's CEO and/or manager.

### C.  Trustees

22.     In or around 2000, Professional Benefit Trust, Inc., an Illinois corporation, served as the

trustee for the Employee Benefit Scheme.  Sunderlage was the company's President, and Linda

was the company's Secretary and Treasurer.

23.     From approximately 2000 to 2010, Professional Benefit Trust Ltd. ("PBT Ltd."), a

corporation established under the laws of Nevis, West Indies, acted as trustee for the Employee

Benefit Scheme.  Sunderlage founded, owns and is the CEO of PBT Ltd.  Linda has served as its

Secretary and Treasurer.  PBT Ltd. was operated out of an office at 2380 Esplanade Drive, Suite

203, Algonquin, Illinois.  First Fidelity Trust Company Ltd. (aka First Fidelity Trust Ltd.) served

as co-trustee with PBT Ltd. between 2000 and 2006.  During at least part of this period,

Sunderlage promoted tax avoidance products other than the Employee Benefit Scheme involving

First Fidelity Trust Ltd.  *See* paragraphs 113 to 121, below.

24.     Since late 2010, defendant Maven U.S. LLC ("Maven LLC"), which conducts business as

Maven LLC, has served as the trustee for trusts involved in the current version of the Employee

Benefit Scheme.  Maven LLC is an Illinois limited liability company managed by two current or former SRG International Ltd. employees:  Leah Bytheway and Tom Musson.   The registered address for Maven LLC is 2380 Esplanade Drive, Suite 203, Algonquin, Illinois.

### D.  Marketers

25.     From the early 1990s to at least 2006, Sunderlage owned and used PBT Marketing, LLC, an Illinois limited liability company, to coordinate seminars promoting the Employee Benefit Scheme and to produce proposals for prospective participants.  Carey Sunderlage ("Carey"), the son of Sunderlage and Linda, promoted the program until approximately 2009.  Sunderlage and Linda, directly or through another company, were members and/or officers of PBT Marketing, LLC.

26.     At present, Sunderlage markets the Employee Benefit Scheme through defendants SRG International Ltd. and SRG International U.S. LLC (collectively referred to as "SRG International").  Until approximately 2005, Sunderlage and Linda indirectly owned most of SRG International Ltd., a Nevis, West Indies, company, through their ownership in SRG.  Since 2005, Sunderlage has owned at least a majority share in SRG International Ltd.  He is also the Chairman and CEO.  Five current or former SRG International Ltd. employees – Eileen Bowe, Tom Musson, Leah Bytheway, Mark Hurwitz, and Zach Kennedy – are registered as the managers of SRG International U.S. LLC, an Illinois limited liability company.  Both companies share an office at 2380 Esplanade Drive, Suite 203, Algonquin, Illinois.

### BACKGROUND ON WELFARE BENEFIT PLANS

27.     As described in more detail below, Sunderlage and SRG International claim that participating companies may avoid paying taxes on funds transferred to the Employee Benefit

Scheme because the companies' contributions are tax-deductible payments to a "welfare benefit plan" that purportedly complies with the Internal Revenue Code.

28.    A welfare benefit plan is a plan that provides certain benefits – such as medical or death benefits – to one or more companies' employees or their beneficiaries.  Where a plan provides benefits for only one company's employees, it is sometimes referred to as a "single employer plan" or "Section 419(e) Plan."  If ten or more employers participate in the plan, and other conditions are met, the plan is commonly called a "10 or more employer plan," "multiple employer plan" or "Section 419A(f)(6) plan."

29.    To finance the employee benefits, participating companies may make contributions to a trust or other fund associated with the plan.  In turn, the trust or other fund generally purchases insurance contracts and other assets.

30.    Federal tax law strictly limits the deductibility of contributions to welfare benefit funds.

31.    A company cannot deduct a contribution to a welfare benefit fund if the payment is not an ordinary and necessary business expense within the meaning of I.R.C. § 162.  For example, a corporation may not claim a deduction for a contribution when, in reality, the payment is a distribution of corporate earnings (a dividend) to the company's shareholders.

32.    A company cannot deduct a payment to a welfare benefit fund if the benefits provided through the fund are deferred compensation under I.R.C. § 404.  *See* I.R.C. § 419(e)(2).  Contributions to a deferred compensation plan are deductible only in the future year in which the recipient employee includes the compensation in his or her gross income.  *See* I.R.C. § 404(a)(5).

33.    Even if contribution is an ordinary and necessary business expense, and the benefits provided through the fund are not deferred compensation, the company still may not deduct its contribution unless the requirements of I.R.C. §§ 419 and 419A are met.

34.     To prevent taxpayers from using welfare benefit funds to obtain improperly inflated tax deductions, Congress limited a company's deductible contributions to the fund's "Qualified Cost" for the taxable year.  *See* I.R.C. § 419(c).  A fund's Qualified Cost is the sum of (1) the "Qualified Direct Cost" for the taxable year, and (2) any addition to a "Qualified Asset Account" for the taxable year (subject to certain limitations).  *See id.*  The Qualified Direct Cost excludes – and therefore an employer may not deduct – contributions paid for premiums on life insurance policies that have cash value.  *See* Rev. Rul. 2007-65.

35.     The "Qualified Cost" deduction limit does not apply to contributions made to a welfare benefit fund that is part of a "10 or more employer plan" (also known as a "multiple employer plan") under I.R.C. § 419A(f)(6).  But a "10 or more employer plan" only exists where (a) there is a single plan (b) to which more than one company contributes but (c) no company regularly makes more than 10% of the total contributions to the plan, and (d) there are no experience-rating arrangements with respect to individual employers.  *See* I.R.C. § 419A(f)(6); Treas. Reg. § 1.419A(f)(6)-1(a)(1).

36.     Purported welfare benefit plans have been vehicles for rampant tax abuse.  In one common tax avoidance scheme, employers pay excessive contributions to purported welfare benefit funds that obtain cash value insurance policies or otherwise set the money aside for the company owners' future benefit.  In doing so, the companies are not really contributing for their business or the benefit of the employees, but rather, are either distributing excess corporate profits or providing deferred compensation to their owners and, in the process, avoiding current federal taxes.  *See, e.g.*, *Neonatology Assoc., P.A. v. Comm'r*, 299 F.3d 221 (3d Cir. 2002); *V.R. De Angelis v. Comm'r*, T.C. Memo. 2007-360, *aff'd* 574 F.3d 789 (2d Cir. 2009); IRS Notice 95-34; IRS Notice 2007-83; IRS Notice 2007-84.

37.     This scheme is so prevalent and abusive that, since 1995, the IRS has warned taxpayers and their representatives that many arrangements claiming to provide substantial tax deductions through contributions to purported multiple employer welfare benefit plans are, in fact, abusive transactions that violate I.R.C. §§ 419 and 419A.  *See* Notice 95-34.  These transactions require large employer contributions relative to the cost of the term insurance that would be required to provide the death benefits under the arrangement, often maintain separate accounting of assets of the employers within the plan, and may insulate the employer from the experiences of the other participating employers in the plan.  The IRS has designated such transactions, and those substantially similar, as "listed transactions."  *See* IRS Notice 2000-15.

38.     Further, since at least 2007, the IRS has warned taxpayers and their representatives that some purported "single employer plans" or "Section 419(e) plans" involving cash value life insurance policies are, in fact, abusive transactions that do not comply with I.R.C. §§ 419 and 419A and are deemed "listed transactions."  *See* IRS Notice 2007-83; Notice 2007-84; *see also* Rev. Rul. 2007-65.   In these transactions, employers take large deductions for contributions to purported single employer plans and the plans accumulate value for the benefit of select owners either inside the life insurance policies or through agreements outside of the policies.  The IRS has designated such transactions, and those substantially similar, as "listed transactions."  *See* Notice 2007-83.

39.     A "listed transaction" is a transaction that is the same as or substantially similar to one of the types of transactions that the IRS has determined to be a tax avoidance transaction and has identified by published guidance as a listed transaction.  Treas. Reg. § 1.6011-4(b)(2).  A transaction is substantially similar to a listed transaction if it is expected to obtain the same or similar types of tax consequences and is either factually similar or based on the same or similar

tax strategy as the specifically-described transaction.  Treas. Reg. § 1.6011- 4(c)(4).  All

taxpayers who participate (as defined by the Treasury Regulations) in a listed transaction must

disclose their participation in that transaction to the IRS.  Furthermore, all persons who are

"material advisors" with respect to listed transaction must report their activity to the IRS.  *See*

I.R.C. § 6111(a) and (b); Treas. Reg. § 301.6111-3.

DEFENDANTS' EMPLOYEE BENEFIT SCHEME

### I.      Overview of the Employee Benefit Scheme

40.      From 1989 to at least 2006, Sunderlage organized and promoted, and by 1991 Sunderlage

and Linda administered, the Employee Benefit Scheme through the PBT Multiple Employer

Plan, a purported "10 or more employer plan" under I.R.C. § 419A(f)(6).  *See* Part III, below.

41.      In or around 2002, Sunderlage began promoting, and Sunderlage and Linda began

operating, purported "single employer plans" as well (referred to in this complaint as "Single

Employer Plans").  *See* Part V, below.

42.      In or around 2006, Sunderlage terminated the PBT Multiple Employer Plan and invited

Owners to adopt the newly-created "Maven Structure," through which their companies transfer

assets offshore by making purportedly tax-deductible contributions to Single Employer Plans.

*See* Part VI, below.  Sunderlage and SRG International promote, and Sunderlage, Maven LLC,

and Randall Administration administer, the Maven Structure.  As of 2009, Linda also

administered the Maven Structure.

43.      This complaint refers to the PBT Multiple Employer Plan, Single Employer Plans, and

Maven Structure collectively as the "Employee Benefit Scheme."

44.      As described in more detail below, Owners are told that they can avoid or substantially

minimize their federal taxes by contributing to the purported "welfare benefit plans" and

deducting the contribution on their companies' tax returns. The contributions greatly exceed the cost of providing employee benefits in the given year. The excess funds are invested and continue to grow, purportedly tax-free, until the Owner elects to withdraw or to terminate from the program. Sunderlage and SRG International claim that, through a variety of mechanisms, Owners can continue to defer or avoid taxes on the contributions and earnings even beyond the point of withdrawal or termination.

45.     On rare occasions, the Employee Benefit Scheme pays claims submitted by participating employees and/or provides benefits to employees other than the Owner. However, the core purpose and effect of the program is to provide Owners with a mechanism to accumulate wealth for their personal benefit through improper tax deductions and tax deferral.

## II.     Marketing of the Employee Benefit Scheme

46.     Sunderlage and SRG International promote the Employee Benefit Scheme primarily to high-income professionals across the country who own small, closely-held companies. They target business owners in the top federal income tax bracket who "[h]ave good cash flow and extra money they don't need for lifestyle," as one SRG International Ltd. handout described its clientele.

47.     Sunderlage and SRG International have marketed the Employee Benefit Scheme by distributing promotional information to potential participants and their financial advisors and representatives and by hosting conferences about the scheme. Sunderlage frequently speaks at these conferences, which Linda has attended and helped organize.

48.     Since 2002, Sunderlage and SRG International have hosted at least twenty-five offshore conferences (primarily in Mexico, the Caribbean, and Canada) in which they make or furnish statements about the benefits and mechanics of participating in the Employee Benefit Scheme

and related financial products. The most recent offshore conference took place in May 2011 in Vancouver, British Columbia, and the next offshore conference is scheduled for October 2011 in Aruba.

49.    Sunderlage and SRG International emphasize the tax and investment benefits to *Owners* of the participating companies, often highlighting how they can use the Employee Benefit Scheme to achieve higher rates of return than by investing their money in a personal account that lacks the Employee Benefit Scheme's purported tax advantages.

50.    Through at least 2004, the Employee Benefit Scheme's marketing materials explicitly stated that the program assumed that the Owner will never draw on any of the employee benefits offered. Instead, the literature contemplated that an Owner would contribute substantial and purportedly tax-deductible sums of money through his company for a specified number of years (often long enough for the Owner to reach retirement age), and then terminate his company's participation in the Employee Benefit Scheme and begin withdrawing the invested assets.

51.    These promotional materials evidence the true purpose of the Employee Benefit Scheme: to enable Owners to receive substantial, purportedly tax-free or tax-deferred income from their companies for their personal use.

52.    Sunderlage has told participants and potential participants to discount the advice of independent advisors who question the legitimacy of the Employee Benefit Scheme's claimed tax benefits. For example, when one Owner in Woodstock, Illinois attempted to terminate from the scheme in 2003, Sunderlage wrote to him stating:

> I know that you have changed your accounts to a different advisor. . . . Beware of the so-called 'experts'. I helped write the current regulations for 419 Plans. We are the national experts on the 419 Plan. You currently have a real gem in your portfolio. Don't let one ignorant advisor mess-up your investment.

53.     In addition to promoting the Employee Benefit Scheme, Sunderlage has promoted other tax avoidance products to Owners, either as a complement or alternative to participation in the Employee Benefit Scheme. *See, e.g.*, Part VII, below.

###     III.     The PBT Multiple Employer Plan

54.     From 1989 to 2006, Sunderlage promoted, and by 1991 Sunderlage and Linda administered, the Employee Benefit Scheme in the form of the PBT Multiple Employer Plan.

55.     Sunderlage amended the PBT Multiple Employer Plan trust agreement at least five times between 1989 and 2006. But at all times, the PBT Multiple Employer Plan did not comply with the federal tax laws, and contributions to the scheme were not tax-deductible.

56.     The PBT Multiple Employer Plan purported to offer death benefits (life insurance) and other benefits to employees of participating companies. To "re-insure" this liability, the PBT Multiple Employer Plan purchased an insurance policy on the life of each covered employee, from which it could recover funds if it had to pay a claim.

57.     To enroll in the PBT Multiple Employer Plan, each Owner signed an "Adoption Agreement" on behalf of his or her company. The Owner used the Adoption Agreement to select the types of employees eligible to receive benefits under the plan and the type of benefits offered to those employees.

58.     Many Owners restricted participation in the plan to the Owner alone, or the Owner and his or her family members (as employees). Benefits were a function of the employee's compensation; therefore, the highest-paid employee – i.e., the Owner – was eligible to receive the majority of the benefits.

59.     The Owner was required to use company assets to pay for all contributions and fees associated with the PBT Multiple Employer Plan.

60.     Most contributions greatly exceeded the cost of providing the selected benefits for that year alone.  For example, one Nebraska surgeon joined the PBT Multiple Employer Plan in 2001 through a corporation he and other family members owned.  The doctor's company contributed more than $950,000 to the program between 2001 and 2006, even though the doctor and his wife were the only covered individuals.

61.     On occasion, Sunderlage and PBT Admin employees advised Owners to backdate company checks so that the Owner could claim that the company made a contribution in a prior year (and thus could take an improper tax deduction in that prior year).

62.     The PBT Multiple Employer Plan typically used each company's contributions to purchase cash value life insurance policies on the lives of the company's Owner(s) (and, in some cases, their family members) and term life insurance policies on the lives of other eligible employees.  In the process, the PBT Multiple Employer Plan allocated the majority (if not all) of the company's contribution into products and accounts for the Owner's benefit.

63.     A cash value life insurance policy, unlike a term life insurance policy, includes a savings component.  A portion of the premium is invested and accumulates cash value that can be accessed by, for example, surrendering the policy or taking out a loan against the policy.

64.     Sunderlage and/or Linda often served as the insurance agents for the purchase of the policies described in paragraph 62, for which they earned commissions.  In addition, Linda was responsible for issuing checks to pay the insurance premiums and the various fees associated with the program.

65.     Each year, PBT Admin issued an "Annual Company Report" to each participating company, detailing the life insurance policies' value and the company's share of any other assets.

The Annual Company Report called these assets the company's "pro-rata share" or "beneficial interest."

66.     Each participating company faced minimal, if any, risk that its contributions would benefit anyone other than the company's Owner or other employees.

67.     Until 2000, Owners could terminate their companies' participation in the PBT Multiple Employer Plan at any time, for any reason. The terminating company's assets were distributed to its eligible employees in proportion to their income. As a result, the Owner received the vast majority, if not all, of the distributions.

68.     After the IRS ruled in 2000 that the PBT Multiple Employer Plan did not comply with federal tax law (see Part IV, below), Sunderlage amended the PBT Multiple Employer Plan to restrict (on paper) the circumstances under which an Owner could terminate his or her company's participation in the plan. Despite these restrictions, Sunderlage (personally or through one of his companies) had discretion to permit termination.

69.     In other words, through the PBT Multiple Employer Plan, each Owner directed substantial, purportedly tax-free funds from his or her closely-held company into an account in which the assets were invested; the Owner had the power to restrict who could receive these proceeds; and the Owner ultimately received all or substantially all of the accrued assets for his or her personal use.

70.     The mechanics of the PBT Multiple Employer Plan can be shown through, for example, the experience of the owner of an Austin, Texas company who joined the program in 1997 ("the Austin Owner"). The Austin Owner executed an Adoption Agreement for his company to join the program and selected only death benefits for eligible employees. However, he was the only person from his company who participated. Between 1997 and 2002, the Austin Owner caused

his company to contribute more than $565,000 to the PBT Multiple Employer Plan to purchase a $3 million Indianapolis Life whole life insurance policy on his life, and to pay for certain fees. In September 2002, a PBT Admin employee told the Austin Owner, "This is the appropriate time to purchase the policy from the [PBT Multiple Employer Plan] and terminate [your company's participation in] the Plan effective December 31st, 2002."  The next month, the Austin Owner requested to terminate.  In February 2003, Carey Sunderlage confirmed that the Austin Owner's company had been terminated from the plan and that he would receive the Indianapolis Life policy, which included an "account value" of approximately $500,000.  But, Carey stated, the IRS Form 1099 issued to the Austin Owner would only report a "termination benefit" of $181,353.74.

### IV.     The IRS Rules the PBT Multiple Employer Plan Does Not Comply with the Internal Revenue Code

71.     In 1997, Sunderlage submitted a request to the IRS on behalf of PBT Admin for a "private letter ruling."   In its request, PBT Admin argued that companies could deduct their contributions to the PBT Multiple Employer Plan in the year in which they were made because the PBT Multiple Employer Plan satisfied the requirements for a "10 or more employer plan" described in I.R.C. §§ 419 and 419A.

72.     A private letter ruling (PLR) is a written statement by the IRS to a taxpayer or his authorized representative interpreting and applying the tax laws to a specific set of facts.  *See* 26 C.F.R. § 601.201(a)(2).  To obtain a PLR, the taxpayer must disclose all relevant facts concerning the transaction, describe his view of how the tax laws apply to the transaction, and ask for the IRS's legal views on specific aspects of the tax effects of the transaction.  26 C.F.R. § 601.201(e).

73.     In 2000, the IRS responded to Sunderlage's request by issuing an adverse PLR, later published in redacted form as PLR 200127047 ("the Adverse PLR"). The IRS concluded that:

    a.  Although Sunderlage had not sought a ruling on the issue, it appeared that the PBT Multiple Employer Plan was an arrangement through which Owners received disguised dividends from their companies, which are not deductible under I.R.C. § 162.

    b.  The PBT Multiple Employer Plan (assuming it was not an arrangement that provided constructive dividends to Owners) was a plan of deferred compensation.

    c.  Accordingly, the PBT Multiple Employer Plan was not a welfare benefit fund as defined in I.R.C. § 419(e).

    d.  Even if the PBT Multiple Employer Plan provided welfare benefits and not deferred compensation, it was an aggregation of individual plans and not a single plan.

    e.  Even if the PBT Multiple Employer Plan provided welfare benefits and not deferred compensation, it maintained an experience-rating arrangement with respect to individual employers.

    f.  Accordingly, the PBT Multiple Employer Plan did not satisfy the requirements of a "10 or more employer plan" under I.R.C. § 419A(f)(6).

74.     Since receiving the Adverse PLR, Sunderlage has repeatedly and falsely claimed that he has been unable to obtain the IRS's views on the tax consequences of the PBT Multiple Employer Plan.

75.     The PBT Multiple Employer Plan trust agreement required that the program terminate if it failed to satisfy I.R.C. § 419A(f)(6). Yet, despite the Adverse PLR, Sunderlage continued to

operate the PBT Multiple Employer Plan by amending the plan, effective December 31, 2000.

This amended version of the PBT Multiple Employer Plan, like prior and subsequent versions,

did not change the substance of the program for tax purposes.

### V.    Single Employer Plans

76.     In July 2003, the U.S. Department of the Treasury issued final regulations applicable to

programs that purport to be "multiple employer plans" under I.R.C. § 419A(f)(6).  *See* Treas.

Reg. § 1.419A(f)(6)-1.

77.     Subsequently, Sunderlage amended the PBT Multiple Employer Plan for a fifth and final

time by prohibiting Owners from directly receiving their invested assets simply by terminating

their companies' participation in the program.  Even though Sunderlage made these changes in

2003, the amended PBT Multiple Employer Plan agreement deemed them effective October 15,

2002 – before the Treasury regulations became final.

78.     Despite this amendment, Sunderlage (personally and through PBT Admin employees)

assured Owners that they could continue to terminate from the plan and withdraw their assets by

transferring the funds from the PBT Multiple Employer Plan into a "Single Employer Plan," a

purported welfare benefit fund established for that company's employees, and then terminating

the Single Employer Plan one year later.

79.     Sunderlage (personally and through employees) told Owners that the one-year waiting

period in the Single Employer Plan was necessary to prevent the IRS from challenging the

termination process (from the PBT Multiple Employer Plan to the Single Employer Plan to the

Owner) as a "step transaction" and listed transaction.

80.     PBT Admin employees told Owners that the transfer of assets from the PBT Multiple Employer Plan to the Single Employer Plan (called a "trustee-to-trustee transfer") would not be a taxable event and would permit the Owner to "gain control" of his or her assets.

81.     Sunderlage's actions in allowing Owners to transfer assets from the PBT Multiple Employer Plan to their company's Single Employer Plan were fundamentally inconsistent with his claim that Multiple Employer Plan was a true Section 419A(f)(6) multiple employer plan, because a true Section 419A(f)(6) plan requires all companies' contributions to be pooled for the benefit of all the participating employers.

82.     From 2003 to 2006, Owners transferred more than $74 million in assets from the PBT Multiple Employer Plan to Single Employer Plans.  Specifically, the PBT Multiple Employer Plan reported the following transfers in its IRS Forms 5500 (Annual Return/Report of Employee Benefit Plan):

      a.   2003: $17,874,830

      b.   2004: $27,960,478

      c.   2005: $8,018,740

      d.   2006: $20,686,392

83.     The operation and terms of the Single Employer Plans were nearly identical to the PBT Multiple Employer Plan.

84.     To establish a Single Employer Plan, each Owner – through his or her company – established a trust purportedly for the purpose of providing benefits to the company's employees. The trust document – a fill-in-the-blank form used by PBT Admin – designated PBT Ltd. and PBT Admin as the trustee and administrator, respectively: the same roles these companies held in the PBT Multiple Employer Plan.

85.     The PBT Multiple Employer Plan then transferred to the Single Employer Plan all assets allocated to that Owner's company, including the life insurance policies on the lives of the Owner and other participating employees.  The benefits provided under the Single Employer Plans matched the benefits selected by the Owner under the PBT Multiple Employer Plan. Sunderlage permitted Owners to terminate their companies' Single Employer Plans and receive the accrued assets within their respective Single Employer Plans, as he permitted under the PBT Multiple Employer Plan.

86.     The experience of a doctor from Turlock, California ("the Turlock Doctor") demonstrates how an Owner could use a Single Employer Plan to withdraw assets from the Employee Benefit Scheme.

     a.  In 1997, the Turlock Doctor, through his company, joined the PBT Multiple Employer Plan and selected death benefits for participating employees.  Only two individuals participated: the Turlock Doctor and his wife.  The PBT Multiple Employer Plan purchased an AmerUs Life cash value insurance policy on the doctor's life and a term policy on his wife's life.  By December 31, 2003, the Turlock Doctor's company had contributed approximately $123,000 to the PBT Multiple Employer Plan and accrued a "beneficial interest" of approximately $111,000.

     b.  On December 31, 2003, the Turlock Doctor requested to terminate his company from the PBT Multiple Employer Plan and to transfer his assets to a new Single Employer Plan.  In March 2004, Sunderlage sent the Turlock Doctor a trust agreement, effective December 31, 2003, that established the Turlock Doctor's Single Employer Plan.  This agreement designated PBT Ltd. and PBT Admin as

the trustee and administrator, respectively. PBT Ltd. then transferred ownership

of the AmerUs Life policies (and the accrued cash value) from the PBT Multiple

Employer Plan to the new Single Employer Plan.

c. On January 12, 2005, the Turlock Doctor sent PBT Admin a letter stating that he

had decided to terminate his company's Single Employer Plan. On June 14, 2005,

a PBT Admin employee provided the Turlock Doctor with (a) the requisite

change of ownership and change of beneficiary forms for the AmerUs Life

policies, so that he could take direct ownership of these policies, and (b) a check

made out to him and signed by Linda Sunderlage from the "PBT Ltd. 419E"

account for the remaining assets, less PBT Admin and PBT Ltd. fees. In total, the

letter stated, he received assets worth more than $113,000 upon terminating.

## VI. The Maven Structure

### a. Introduction of the Maven Structure

87. In a letter dated July 12, 2004, the IRS informed Sunderlage that he was under

investigation for promoting tax avoidance transactions.

88. By the fall of 2004, Sunderlage began a significant reorganization of the Employee

Benefit Scheme. The new structure ultimately became known as the "Maven Structure."

89. As described in greater detail in paragraphs 98 to 110 below, in the Maven Structure,

company contributions flow through a Single Employer Plan into an account within a foreign

company, Maven Assurance Ltd., where they are invested until the Owner terminates from the

program. At that time, the Owner receives the assets for his or her personal use.

90. The effect of the Maven Structure – as with the predecessor PBT Multiple Employer Plan

and stand-alone Single Employer Plans – is to provide Owners with a means to receive

purportedly tax-free or tax-deferred income. For example, in March 2007, Sunderlage and Carey told potential Maven Structure participants that "[w]ith low or no claims, your premium can accumulate with available investment options with absolute portfolio returns. This new strategy allows flexibility for asset management and distribution of income."

91.     According to Sunderlage, the Maven Structure was designed to achieve several goals, including to "[p]rovide a better exit strategy at termination," "[p]rovide a lower tax liability at termination," "[e]liminate any current objection from the IRS on deductibility," and "eliminate the Listed Transaction problem."

92.     Sunderlage refuses to disclose details regarding the Maven Structure to participants and potential participants while they are in the United States. Instead, he requires that interested individuals travel to offshore conferences that he and SRG International host in order to learn more. For example, a September 3, 2008, letter from PBT Admin encouraged Maven participants to attend an October 2008 SRG International Ltd. conference in Vancouver, British Columbia because "[m]any of the topics discussed hold important information of how to tie your 419(e) plan and Maven Assurance into a better structure to enhance long-term income and wealth building."

### b.  Implementation of the Maven Structure

93.     To implement the Maven Structure, Sunderlage and his wife, Linda, caused the formation of Maven Assurance Ltd. ("Maven Assurance"), an offshore company established under the laws of Anguilla, in April 2006. Sunderlage, his son Carey, and Andrew Keuls served on the original Board of Directors. Hess Holding Ltd., another Anguilla company, owns Maven Assurance. Linda Sunderlage and Andrew Keuls each indirectly own 50% of Hess Holdings Ltd.

94.     In or about June 2006, PBT Ltd. withdrew all or substantially all value from the life insurance policies held by the PBT Multiple Employer Plan on each Owner's life by taking out loans against the policies' cash value.  In July 2006, PBT Ltd. transferred approximately $70 million, representing the policy loan proceeds and other assets, to Maven Assurance.

95.     On October 31, 2006, the PBT Multiple Employer Plan terminated.  The following day, Maven Assurance became a purported offshore "captive" insurance company through which the participating companies' Single Employer Plans provide employee benefits to Owners and any other employees the Owners have selected, as described below.

96.     PBT Ltd. initially served as trustee for the Single Employer Plans in the Maven Structure but, by late 2010, Maven LLC assumed the role.  Likewise, PBT Admin served as Maven Assurance's third-party administrator until approximately 2010, when Randall Administration took over.

97.     Beginning in November 2007, Sunderlage made participation in the Maven Structure mandatory for all Owners who wished to continue or begin participating in the Employee Benefit Scheme.  Sunderlage told participants with Single Employer Plans who had not adopted the Maven Structure that, as a result of IRS Notice 2007-83, IRS Notice 2007-84, and Revenue Ruling 2007-65 (all issued in October 2007), "**the IRS now considers your plan an abusive arrangement**" (emphasis in original).  Consequently, Sunderlage required participants to adopt the Maven Structure or terminate from the Employee Benefit Scheme entirely by December 31, 2007.  According to Sunderlage, the adoption of the Maven Structure "would not trigger a taxable event" and would bring the Single Employer Plans into compliance with federal tax law.

### c. Mechanics of the Maven Structure

98.     To join the Maven Structure, each Owner must establish a Single Employer Plan for his

or her company of the type described in paragraphs 83 to 85 above, if one does not already exist.

99.     Each Single Employer Plan in the Maven Structure offers "living benefits" and (in some

cases) death benefits through policies that Maven Assurance issues for each employee.

100.    Each Owner – through his or her company – must contribute at least $15,000 per year to

the Single Employer Plan to participate in the Maven Structure.  However, the company can pay

more if the Owner so chooses, which many do.

101.    Maven Structure literature states that participating companies can deduct at least the

living benefits portion of their contributions to their Single Employer Plans, and Sunderlage has

told Owners that their companies' entire contributions to the Maven Structure are deductible.

102.    Most contributions to the Maven Structure exceed the ordinary and necessary cost of

providing the selected benefits for that year.

103.    Maven Assurance places the excess of the company's contributions, less expenses, into a

segregated account within Maven Assurance established for that participant.  This account has

been called, at various times, a "Protected Premium Account" ("PPA account"), "Maven cell," or

"separate/separate account."  The PPA account also holds any assets the Owner accrued during

his or her participation in the predecessor PBT Multiple Employer Plan.

104.    Each Owner beneficially owns the PPA account by, directly or indirectly, purchasing

$2,500 in Maven Assurance stock that is tied to his or her company's PPA account.  Maven

Assurance transfers the funds in the PPA account to the Owner by declaring a "dividend" on the

stock linked with that account.  When an Owner terminates from the program, Maven Assurance

declares a dividend equal to the total balance of the PPA account.

105.    Each Owner can select from three investment strategies (ranging from conservative to aggressive) for his or her PPA account assets.  Profits earned on the assets in a PPA account are not shared with other PPA accounts.

106.    At least until January 1, 2011, most participants indirectly owned their PPA accounts through an international variable universal life insurance policy (IVUL) or an international annuity, often owned by the Owner's offshore trust.  Under this model, the Owner established and funded an offshore trust that purchased the IVUL or international annuity and placed some or all of the trust's assets inside the policy.  The Owner then used the funds within the IVUL or international annuity to purchase the Maven Assurance stock that controls the Owner's PPA account.  Acadia Life Ltd., an offshore company, typically issued the IVUL or international annuity policies.

107.    Sunderlage has assisted Owners in implementing the international annuity option by signing the annuity applications offshore on their behalf.  SRG International has assisted Owners in granting Powers of Attorney to Sunderlage to sign these policies.

108.    The Owner's offshore trust is typically located in Nevis, West Indies.  SRG International and Woodmont Trust Ltd. (also known as Woodmont Trust Company Ltd.), an SRG International-managed entity, administer the paperwork to establish the offshore trusts.

109.    Carey Sunderlage illustrated the resulting structure as follows during a presentation he made on behalf of SRG International Ltd. called "Wealth Protection and Accumulation":



110.    When an Owner uses the offshore trust structure to hold his or her Maven Assurance stock, the Owner's IVUL or international annuity receives the PPA account balance after the Owner terminates from the Maven Structure.

111.    Sunderlage has told Owners that the transfer of PPA account assets into an IVUL or an international annuity is not a taxable event.  In fact, Employee Benefit Scheme literature has emphasized that this structure permits the Owner to receive significant "tax-free annual income" after terminating from the scheme.

112.    SRG International, Maven LLC, and Randall Administration have made statements to Owners and their advisors that one or more court decisions concerning the tax treatment of participating in purported "welfare benefit plans" do not negatively affect the tax benefits associated with the Maven Structure.  For example, on February 4, 2011, Leah Bytheway (as the Chief Operating Officer for Randall Administration, but who also is a member of SRG

International U.S. LLC and a current or former SRG International Ltd. employee) wrote a letter to Maven participants stating: "[W]e believe that the Tax Court's decisions pursuant to" *Cadwell v. Commissioner*, 136 T.C. No. 2 (T.C. 2011) "have no impact on the 419(e) Plans with Maven LLC/Randall Administration."  Kelsey Hellwarth, Director of Marketing for SRG International U.S. LLC and Randall Administration, emailed the letter to participants' advisors the same day, adding, "While we do NOT offer legal, financial or tax advice, it is our *opinion* that this case has no impact on the 419(e) Plans with Maven LLC / Randall Administration (formerly Professional Benefit Trust)."  (Emphasis in original.)

### VII.    Other Sunderlage Tax-Avoidance Schemes

113.    In addition to the Maven Structure, Sunderlage has also promoted and sold offshore "asset protection" trust products and offshore "Business Protection Plans."  These products serve as an alternative or supplement to the Employee Benefit Scheme.

114.    Through the offshore "asset protection" trust program, Sunderlage and the Sunderlage Resource Group aid participants in establishing their own offshore trusts that purchase international cash-value life insurance policies.  Each trust then transfers all or substantially all of the trust assets into the insurance policy, where the assets purportedly enjoy tax deferral while they are invested.

115.    Until approximately 2006, First Fidelity Trust Ltd. served as the trustee for at least some participants' offshore "asset protection" trusts.  In or about 2006, at least some of Sunderlage's customers transferred their offshore trusts to Woodmont Trust Ltd., an SRG International-managed entity that is connected to the Maven Structure.

116.    Under the Business Protection Plan, participants establish an offshore "asset protection" trust and then – through their closely-held companies – make sizeable payments to an offshore

insurance company purportedly for single-year insurance policies offering coverage such as "hostage insurance," in which the company is insured against the risk that its owner is taken hostage in that year. As with contributions to the Employee Benefit Scheme, the Business Protection Plan contributions far exceed the cost of coverage for the year, and Sunderlage has told Business Protection Plan participants that their premium payments are deductible business expenses.

117.    Sunderlage has offered Employee Benefit Scheme participants the option of using their contributions to the Employee Benefit Scheme to make Business Protection Plan premium payments (at least a portion of which would revert to the participant's offshore trust at the end of each year).

118.    Sunderlage has promoted the Business Protection Plan, offshore "asset protection" trust products, and the Employee Benefit Scheme to potential participants at the same offshore conferences. Two companies, Foster & Dunhill Ltd. and BPS International LLC, hosted these conferences until at least 2003. Defendant SRG International Ltd. and BPS International LLC hosted these conferences together until at least 2005. Sunderlage directly or indirectly owned a share of BPS International LLC until in or around 2004, and spoke at these conferences.

119.    Until approximately 2006, Fidelity Insurance Company Ltd. ("FICL") acted as an insurance company issuing the life insurance policies used in the Business Protection Plan and offshore "asset protection" trust products that Sunderlage promoted. FICL is part of the same group of companies as First Fidelity Trust Ltd., which served as co-trustee of the PBT Multiple Employer Plan between 2000 and 2006.

120.    In connection with the Business Protection Plan and offshore "asset protection" trust products, Sunderlage (through BPS International LLC, Sunderlage Resource Group, and/or

defendant SRG International Ltd.) received fees and commissions from the sale of FICL insurance products and the formation of participants' offshore trusts.

121.     Beginning in 2004, some Business Protection Plan and/or offshore "asset protection" trust participants have caused their trusts to utilize policies issued by Acadia Life Ltd. – the same company whose policies are used in the current Maven Structure – rather than FICL policies.

## FALSE STATEMENTS

122.     Sunderlage (personally and through his companies) and SRG International have made or furnished or caused other persons to make or furnish false and/or fraudulent statements with respect to the tax benefits of the Employee Benefit Scheme, including statements that the Owner's company may deduct its contributions to the Employee Benefit Scheme.

123.     Specific false statements made to participants and potential participants with respect to the Employee Benefit Scheme include:

a.   "Are my contributions to the Trust tax deductible?  Yes, deposits are tax deductible under IRC § 162 as ordinary and necessary business expenses." Answers to Commonly Asked Questions, PBT Multiple Employer Plan promotional material, June 9, 2000.

b.   "Under IRC Sec. 162 IT'S COMPLETELY TAX DEDUCTIBLE.  THAT'S RIGHT.  TAX DEDUCTIBLE.  Under IRC Section 162, this is defined as an ordinary and necessary business expense, and is therefore tax deductible." Undated Professional Benefit Trust promotional material.

c.   "We have discovered that as of today's date October 24 [sic], no plan sponsors other than Niche Marketing and Professional Benefit Trust have figured out how to maintain 100% tax deductibility for employer planned contributions on 419

plans . . . . Professional Benefit Trust has totally redesigned the benefit package so that there is * No limit on employer contribution [sic] * No income participation rules * No employee participation requirements * Assets can be removed from the Trust without violating the new proposed rules * Through a captive reinsurance arrangement 70% of the deferred tax can be eliminated . . . . So …why not learn how you can participate in this newly regulated 419 market" by attending a PBT "419A(f)(6) Rescue Workshop." October 24, 2002 letter from Sunderlage to potential participants' advisors.

d. "The new business structure will add significant flexibility and benefits to 419 sales, plus it will eliminate the Listed Transaction problem, reduce termination taxes to long term capital gains, and much, much more!" March 14, 2005 letter from Sunderlage and Carey to participants' advisors.

e. "Welcome to Professional Benefit Trust. . . . It's a benefit plan with options. A benefit program that won't discriminate against you as a business owner. A benefit system that doesn't cap contributions. A benefit trust that is completely tax deductible." PBT website (www.pbt419.com), July 26, 2005.

f. "Who is PBT" "It's a Multiple Employer Welfare Benefit Trust authorized under IRC §419A(f)(6) [sic]." October 28, 2005 PBT Welfare Benefit Trust and Reinsurance Conference Synopsis.

g. "Are 419 Trust contributions tax deductible? Yes [u]nder IRC Section 162 . . . ." October 28, 2005 PBT Welfare Benefit Trust and Reinsurance Conference Synopsis.

h.   "Enclosed is a new 419(e) Single Employer Trust document with an additional signature page for your signature.  In order to <u>continue tax deductible contributions</u> to your company Welfare Benefit Plan, <u>you must sign</u> and return this signature page to PBT Administration, LLC."  November 3, 2006, letter from Sunderlage and Carey to "All 419A(f)(6) Participating Employers" (emphasis in original).

i.   "Corporate contributions to 419(e) plans are fully tax deductible and you can still discriminate as to what employees can participate.  This is because the benefits provided by the plan are qualified as direct qualifying costs, i.e., term insurance and living benefit coverage."  November 6, 2006 letter from Sunderlage to plan participant and advisor.

j.   "Those that have attended" SRG International's offshore conferences "have become excited about PBT tax deductible [sic] new 419(e) Plan which offers living benefits . . . .  The tax deductible contributions are significantly greater than pension plans and are fully discriminatory."  March 21, 2007 letter from Sunderlage and Carey to "PBT Client."

k.   "As a current participant in the welfare benefit plan with Professional Benefit Trust and the Maven Assurance structure, we want to inform you of an educational opportunity to learn more about the structures in which you are involved. . . ."  At the October 2008 SRG International Ltd. conference in Vancouver, "[t]here will be a repeated emphasis of . . . Asset Accumulation: Learn how you are enhancing your portfolio by deferring taxes on your investments until you need access to them.  In addition, learn how your strategies

for tax-deductibility are further enhancing your portfolio." January 2, 2008 letter to Maven participants from SRG International Ltd., signed by Sunderlage and Carey.

l. "Because of PBT provisions and the captive insurance company structure, the PBT 419(e) plan is 'outside the scope' of Notices 2007-84 and 2007-83 and meets the requirements contained in Revenue Ruling 2007-65, which was also part of the guidance." September 3, 2008 letter to Maven participants from PBT Admin.

m. All statements that the Maven Structure offers a legitimate "single employer plan" or "419(e) Plan," including but not limited to the statements identified in paragraphs 92, 112, and 123(h), (i), and (j).

124. The statements described above are false and/or fraudulent for several reasons, including:

a. Contributions to the Employee Benefit Scheme are not ordinary and necessary business expenses under I.R.C. § 162 and therefore are not deductible;

b. Even if contributions to the Employee Benefit Scheme are "ordinary and necessary" within the meaning of I.R.C. § 162, they are deferred compensation to the Owners and therefore are not currently deductible.

c. The PBT Multiple Employer Plan did not qualify as an I.R.C. § 419A(f)(6) "10 or more employer plan" and therefore contributions to the PBT Multiple Employer Plan were not deductible without limitation.

d. Contributions to the Single Employer Plans, even if they use "welfare benefit funds" under I.R.C. §§ 419 and/or 419A, are not deductible under the limits set by I.R.C. § 419.

## HARM TO THE GOVERNMENT AND THE PUBLIC

125.    Over 500 companies contributed over $135 million to the Employee Benefit Scheme

from inception in 1989 to December 2000.

126.    From 2001 to 2006, the PBT Multiple Employer Plan received at least an additional

$104,654,124 in contributions.  Specifically, the PBT Multiple Employer Plan reported on an

IRS Form 5500 that companies made the following contributions in each year:

| Year | Contributions Received |
|------|------------------------|
| 2001 | $19,398,804 |
| 2002 | $21,354,652 |
| 2003 | $19,850,869 |
| 2004 | $23,208,883 |
| 2005 | $17,151,053 |
| 2006 | $3,689,863 |
| *Total* | *$104,654,124* |

127.    The figures in paragraph 126 do not include contributions made directly to the Single

Employer Plans or any contributions made through the Maven Structure.

128.    Assuming that contributions after 2006 continued at the 2001 to 2006 average rate of

approximately $17,442,000 per year, participating companies will have transferred another

$87,210,000 in contributions to the Maven Structure by the end of 2011.

129.    Total contributions to the Employee Benefit Scheme from 1989 to the present are

therefore estimated to exceed $300 million.  Sunderlage and SRG International have falsely told

Owners that their companies could deduct these contributions, improperly depriving the United

States of tax revenue on potentially more than $300 million of income.

130.    As of January 2010, the Owners of more than 230 companies were participating in the

Maven Structure.

131.    Sunderlage and SRG International continue to promote the Maven Structure to new

Owners, and Defendants continue to operate the Employee Benefit Scheme for existing Owners.

For example, SRG International is hosting offshore conferences this year in Puerto Vallarta, Vancouver, and Aruba.

132.    If Defendants are not enjoined, the United States will suffer irreparable harm from the underpayment of tax liability and the exhaustion of resources to enforce the internal revenue laws, and the substantial losses caused by Defendants' actions will continue to increase.

133.    The Internal Revenue Service is harmed because it must dedicate scarce resources to detecting and examining inaccurate returns filed by participants, and to attempting to assess and collect unpaid taxes.

134.    Participants in the Employee Benefit Scheme are also harmed because they are liable for any unpaid tax, plus interest and penalties.

**COUNT I:   INJUNCTION AGAINST TRACY SUNDERLAGE, SRG INTERNATIONAL LTD., AND SRG INTERNATIONAL U.S. LLC UNDER I.R.C. § 7408 FOR ENGAGING IN CONDUCT SUBJECT TO PENALTY UNDER I.R.C. § 6700.**

135.    The United States incorporates by reference the allegations contained in paragraphs 1 through 134.

136.    Section 7408 of the Internal Revenue Code authorizes a court to enjoin any person or entity that has engaged in any conduct subject to penalty under I.R.C. §§ 6700 or 6701 if the court finds that injunctive relief is appropriate to prevent recurrence of such conduct.

137.    Section 6700(a)(2)(A) of the Internal Revenue Code imposes a civil penalty on any person who (1) organizes or participates in the organization or sale of (2) any plan or arrangement; and (3) who, in connection with such organization or sale, makes or furnishes, or causes another to make or furnish, a false or fraudulent statement with respect to the allowance of a tax deduction or other tax benefit, (4) if the person knows or has reason to know the statement is false or fraudulent, (5) and if the statement is material.

138.    The PBT Multiple Employer Plan, Single Employer Plans, and Maven Structure are plans or arrangements within the meaning of I.R.C. § 6700.

139.    Sunderlage has been intimately involved in the organization and operation of the Employee Benefit Scheme since its inception in 1989.   He has created and managed the entities required for implementation of the scheme, including SRG International Ltd. (which, in turn, manages several involved entities).

140.    Sunderlage, SRG International Ltd., and SRG International U.S. LLC have directly and indirectly promoted the scheme to prospective participants.

141.    In connection with the organization and/or sale of the Employee Benefit Scheme, Sunderlage, SRG International Ltd., and SRG International U.S. LLC have made or furnished or caused others to make or furnish material and false and/or fraudulent statements with respect to the Employee Benefit Scheme's purported tax benefits.

142.    Sunderlage, SRG International Ltd., and SRG International U.S. LLC knew or had reason to know that the statements were false and/or fraudulent, including by virtue of their core roles in the Employee Benefit Scheme.

143.    For example, Sunderlage – SRG International Ltd.'s CEO – has extensive knowledge of the Employee Benefit Scheme and the Adverse PLR, and he has held himself out as highly familiar with the provisions in the Internal Revenue Code relating to the Employee Benefit Scheme.  In a June 2004 letter to a financial advisor in San Carlos, CA, Sunderlage stated:

> I have sat in the courtroom, been in front of the IRS Task Force on 419 plans, testified at the Treasury, was the author of [Congressional bill] HR2380 and lobbied for these [Treasury] regulations.  I know this for sure, PBT is in full compliance with the IRC.

144.     If Sunderlage, SRG International Ltd., and SRG International U.S. LLC are not enjoined,

they are likely to continue to promote tax-fraud schemes, including the Employee Benefit

Scheme that is the subject of this complaint.

**COUNT II:     INJUNCTION AGAINST ALL DEFENDANTS UNDER I.R.C. § 7402**

145.     The United States incorporates by reference the allegations contained in paragraphs 1

through 144.

146.     Section 7402(a) of the Internal Revenue Code authorizes a court to issue orders of

injunction as may be necessary or appropriate for the enforcement of the internal revenue laws,

even if the United States has other remedies available for enforcing those laws.

147.     Defendants' activities substantially interfere with the enforcement of the internal revenue

laws, including by promoting, organizing, and administering the Employee Benefit Scheme.

148.     An injunction prohibiting Defendants from organizing, promoting, or administering (or

helping others to organize, promote, or administer) tax schemes, including the schemes described

in this complaint, is needed to stop Defendants from interfering with the proper administration

and enforcement of the internal revenue laws.

149.      Unless enjoined by this Court, Defendants are likely to continue to engage in their

improper conduct.

150.      If Defendants are not enjoined, the United States will suffer irreparable harm from the

underpayment of tax liability and the exhaustion of resources to enforce the internal revenue

laws, and the losses caused by Defendants' actions will continue to increase.

151.     While the United States will suffer substantial, irreparable injury if Defendants are not

enjoined, Defendants will not be greatly harmed by being compelled to obey the law.

152.    The public interest would be advanced by enjoining Defendants because an injunction will stop their improper conduct and the harm that conduct is causing the United States and the public.

153.    An injunction under I.R.C. § 7402 is necessary and appropriate, and the United States is entitled to injunctive relief under I.R.C. § 7402.

**RELIEF SOUGHT**

WHEREFORE, plaintiff United States of America respectfully prays the following:

A.    That this Court find that Tracy Sunderlage, SRG International Ltd., and SRG International U.S. LLC engaged in conduct subject to penalty under I.R.C. § 6700 and that injunctive relief under I.R.C. § 7408 is appropriate to prevent recurrence of that conduct;

B.    That this Court find that Tracy Sunderlage, Linda Sunderlage, SRG International Ltd., SRG International U.S. LLC, Maven U.S. LLC, and Randall Administration LLC engaged in conduct interfering with the administration and enforcement of the internal revenue laws and that injunctive relief is appropriate to prevent recurrence of that conduct under I.R.C. § 7402(a);

C.    That this Court, pursuant to I.R.C. §§ 7402 and 7408, enter a permanent injunction prohibiting Sunderlage, SRG International Ltd., SRG International U.S. LLC, and any other person in active concert or participation with them, from directly or indirectly:

    a.   Promoting or selling any version of the Employee Benefit Scheme described in this complaint;

    b.   Promoting or selling any plan or arrangement that is similar to the Employee Benefit Scheme, including any plan or arrangement that claims to be a welfare

benefit plan or to allow an employer to make deductible contributions to a

welfare benefit fund under I.R.C. § 419 and/or I.R.C. § 419A;

c.  Promoting or selling any plan or arrangement that advises or assists others in

violating or attempting to violate the internal revenue laws or unlawfully

evading the assessment or collection of one's federal tax liabilities;

d.  Engaging in conduct subject to penalty under I.R.C. § 6700, *i.e.*, organizing or

selling any plan or arrangement and in connection therewith (a) making a

gross valuation overstatement or (b) making or furnishing false or fraudulent

statements with respect to the tax benefits derived from participation in a plan

or arrangement, when he knows and/or has reason to know the statements are

false or fraudulent as to a material matter; and

e.  Engaging in any other conduct subject to penalty under any provision of the

Internal Revenue Code.

D.  That this Court, pursuant to I.R.C. §§ 7402 and 7408, enter a permanent injunction

prohibiting Defendants, and any other person in active concert or participation with them,

from directly or indirectly:

a.  Acting as trustee or administrator for, or otherwise organizing, administering,

or implementing any version of the Employee Benefit Scheme described in

this complaint;

b.  Acting as trustee or administrator for, or otherwise organizing, administering,

or implementing any plan or arrangement that is similar to the Employee

Benefit Scheme, including any plan or arrangement that claims to be a welfare

       benefit plan or to allow an employer to make deductible contributions to a welfare benefit fund under I.R.C. § 419 and/or I.R.C. § 419A;

c.   Organizing, administering, or implementing any plan or arrangement that advises or assists others in violating or attempting to violate the internal revenue laws or unlawfully evading the assessment or collection of one's federal tax liabilities;

d.   Selling or organizing, or causing the sale or organization of, any type of corporation, trust, limited liability company, arrangement of business entities, or plan which he knows or has reason to know is designed to or will be used to facilitate non-compliance with the federal tax laws; and

e.   Engaging in any other conduct that substantially interferes with the administration or enforcement of the internal revenue laws.

E.      That the Court, pursuant to I.R.C. § 7402, order Defendants to produce to counsel for the United States within 30 days of entry of judgment in this case a list identifying (by name, address, e-mail address, phone number, and Social Security or other tax identification number) all of the companies and Owners of such companies who have made payments to Professional Benefit Trust Ltd., PBT Administration LLC, Randall Administration LLC, and/or Maven U.S. LLC in connection with the Employee Benefit Scheme;

F.      That the Court, pursuant to I.R.C. § 7402, order Defendants, at their own expense, to send by mail to each individual identified in paragraph E above a copy of the permanent injunction entered against him and a copy the Court's findings in support of the permanent injunction.

G.      That the Court, pursuant to I.R.C. § 7402, order Defendants each to file with the Court, within 45 days of the date on which the permanent injunction is entered, a certification signed under penalty of perjury that he or she has complied with paragraphs E and F above;

H.      That the Court allow the United States full post-judgment discovery to monitor compliance with the injunction;

I.      That the Court retain jurisdiction over this action for the purpose of implementing and enforcing the final judgment and any additional orders necessary and appropriate to the public interest; and

J.      That the Court grant the United States such other and further relief as the Court deems appropriate.

/

/

/

/

/

/

/

/

/

/

/

/

Dated this 13th day of July, 2011

Respectfully submitted,

PATRICK J. FITZGERALD
United States Attorney

/s/ Ellen K. Weis
ELLEN K. WEIS (VA Bar No. 77454)
Trial Attorney, Tax Division
U.S. Department of Justice
Post Office Box 7238
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 616-9010
Fax: (202) 514-6770
ellen.k.weis@usdoj.gov

/s/ Harris J. Phillips
HARRIS J. PHILLIPS (MA Bar No. 675603)
Trial Attorney, Tax Division
U.S. Department of Justice
Post Office Box 7238
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 616-1906
Fax: (202) 514-6770
harris.j.phillips@usdoj.gov